Badilla v. National Air Cargo, Inc. This cause comes before you today, Your Honors, from the grant of summary judgment by the Western District of New York, adopting the magistrate judge's recommendation, which found that the wrongful death tort claims originally bought in state court and brought by the crew's spouses are preempted by federal law under an expansive broadening of our Supreme Court's understanding in Boyle v. United Technologies by applying the combatant activities exception to the Federal Tort Claims Act to a civilian aircraft operated by a civilian crew on approach to land at a civilian airport, which had civilian air traffic controllers employed by the appellee providing control. Is it fair to characterize it as a civilian airport? I think I read somewhere that three quarters of the traffic was military traffic and the military essentially was in charge of the airport, the U.S. military. Am I wrong about that? Yes, Your Honor. Respectfully, the airport was under the direct control of the Afghan government and it was The military aspect of it was actually NATO, Your Honor, of which obviously the United States is a member. But to say that it was being a U.S. military base would not be correctly identifying what the nature of the airport was. Regardless, on the night in question, Your Honor, the only participants that were involved in the control of the two civilian aircraft that were on approach to land was a civilian tower controller employed by Midwest Air Traffic Control. The sole defendant before the court, Midwest Air Traffic Control Services, was a U.S. company providing air traffic control services from Kabul Tower in Afghanistan to the subject aircraft, which has the tail number TKU-662, at the time of the crash, which was and it was part of a subcontract that Midwest had with Ready Management Services, which in turn had a prime contract with the Navy SPAWAR. And so, Your Honors, it is the plaintiff's position in this case that absent specific direction from the company's exception to the Federal TORPS Claims Act should not be afforded to a private government contractor or subcontractor such as Midwest Air Traffic Control. As the court, I'm sure, is aware, when looking at preemption, the first place that needs to be looked at is the plain language. The district court in this case, in applying the rationale of Boyle, which was a Supreme Court case that allowed for the defense of discretionary function to the manufacturer of a military helicopter to have immunity from the claims of the plaintiff who claimed that the very defect that caused the death of the crew member in that case was actually the specifications of the government. And so Boyle looked at the government contractor using the specifications of the government. In Boyle, there was a real conflict. The claim was that the door should have opened in and the government wanted a door that opened out. So is there anything comparable to that in this case, where there is a conflict between the standard of care that you suggest should have applied here and what the Navy wanted? No, Your Honor. In fact, the air traffic controller at the tower was acting under the ICAO rules, which are civilian rules. And as Your Honors are well aware, the actions of a FAA air traffic controller in the United States, the negligence of an air traffic controller are subject to the Federal Tort Claims Act. And an action can be brought against the controller. And so there is no conflict. And that was looking back at what the district court judge here, what the district court judge did here, is the district court judge failed to identify that there was any conflict between the claims that were being made by the plaintiffs and the he would call their base, which means to turn them back to the airport and not informing them that they were flying into a mountain range, which ultimately they made contact with. If the presider will allow me, I wonder whether I can ask whether you could, if you're right, we then get to the issue of whether the summary judgment was essentially properly granted on the merits. And I'm one, you know, the notion that they were under visual flight rules and therefore it was entirely the responsibility of the defendant or defendants to maintain separation from the terrain. And so even if you get, you're correct as to the jurisdiction of the court, then you have to hop over or somehow overcome the notion, the district court's notion that, well, if we have jurisdiction, the defendant wins on summary judgment on the facts. Your Honor, on the facts, where the district court erred in determining that an aircraft that has visual flight rules is responsible for its own navigation solar. Flying visual flight rules when not being controlled by a controller does have the ultimate responsibility to maintain distance from terrain. However, the facts of this case, Your Honor, and as our experts had testified, when the air traffic controller took control of the TKU 662, when he decided to cancel the landing, instead of saying, resume your own navigation, which means you now have VFR, you now have to go and maintain your distance from terrain, the controller didn't do that. The controller said, I will call your base, turn left, continue on down leg, and I will call your base. That, according to our experts, is the controller taking control of the aircraft and is therefore responsible to give direction to the aircraft and to allow the aircraft to maintain situational awareness and distance from terrain. The other, and I don't want to skip it, Your Honor, but the other end of the summary judgment on the facts was the court found that the pilot was the sole proximate cause of the crash. And as the court is well aware, sole proximate cause, the proximate cause is normally for the jury to decide. And in this case, given the opinions of our air traffic control expert, that the crew could rely on the air traffic controller in stating, I will call your base, was relying on that aircraft controller and believing that the aircraft was being controlled by radar, as opposed to simply by the tower control. All right, thank you. You have some time for rebuttal. We'll hear from the other side. Yes, good morning, Your Honor, and may it please the court, this is John Friedenberg. I am representing Midwest Air Traffic Control, the appellee here. First on the issue of preemption, Your Honors, it is difficult to imagine an interest more uniquely federal than the allocation of resources in a time and place of military conflict. And here, the U.S. provided the Kabul Tower, and we're talking about the tower, not the entire airport. They provided the Kabul Tower with exactly and only the equipment that was needed to operate as a VFR, a visual flight rules tower. And the purpose of the controllers in the tower was to provide order and sequence of flights coming in and flights going out. It was not to give instruction. What if you took the equipment out of the picture? In other words, there still is a claim that the air traffic controller just messed up in his judgment in taking control. That claim, I don't understand to be a claim that the resources were insufficient. It's important to understand the capacity and capabilities of the personnel in the tower. I mean, I think if the claim were the resources were insufficient and that's the basis of our negligence claim, I could see that that would be in direct conflict with the United States deciding these are the resources we are going to provide. But I don't understand that to be the claim. I understand the claim to be that the air traffic controller messed up. And so what I'm asking is, where is there a conflict, you know, as we had in the Boyle case with the door in and out? Well, the conflict is what what the plaintiffs are attempting to impose on the air traffic controllers is a duty beyond which what the controlling documents and the procedures dictate. When the contract was adopted, Your Honor, which was the Navy contracting with Readiness Management Service and then in turn, Readiness Management contracting with my client. The contract expressly adopted controlling documents for Kabul and for the tower that dictated that visual flight rules flight involved the sole and exclusive responsibility of the pilot for maintaining the pilot separation from terrain. The terrain is ubiquitous around the Kabul airport and the city of Kabul. And the what about the what about the argument that the VFR does not apply because the air traffic controller took control? Well, I mean, is that is there anything in the documents that well, this is that that could be seen to be in conflict? Well, it's it's it's it's not only in conflict, Your Honor. It's untrue. If you read the testimony of plaintiff's own air traffic control expert, Julia Harvey. I asked this question of Julia Harvey numerous times, and it's set forth in my brief. It's simply not true that communication between tower and pilot somehow vitiates or removes the VFR status. Even Ms. Harvey, the plaintiff's ATC expert, expressly testified that this flight was in VFR at all times. And for guidance, Your Honor, I would ask the court to look at the Wojohowicz versus U.S. case, which is cited in our brief. It's a First Circuit case, and there are very similar circumstances. It's very instructional on how VFR actually works, which, with all due respect, is different from how my opponent has characterized it to this court. The way VFR works is regardless of whether the pilot is in communication with an ATC facility, the VFR responsibility for separation from terrain is absolute and unchanging, simply receiving a sequencing direction. And that's all that the tower was doing. The tower was looking at flights that were coming into land at the airport in close proximity to one another. And that's true, but it's also true, isn't it, that the pilot was told, make a left turn, fly downwind, which meant fly east, which was in effect towards the mountain. I mean, he was so that it wasn't just it wasn't just sequencing. He'll come in after that plane. He said, make a left turn and fly east. And moments later, he flew east and crashed into the mountain. Your Honor, with all due respect, any compass direction in Kabul is going to send a flight, at least into vicinity of mountains. And that's where the pilot's responsibility and professionalism comes in. You'll note, I would hope, that turning left was simply an instruction to get into your downwind, downwind being parallel to the approach, as I know you appreciate. He did not give a compass heading. He, importantly, did not give an altitude. And in the tower, the altitude of the aircraft was not discernible by our personnel based on the equipment provided by the United States. So you're saying that the plane might have been above the height of the surrounding mountains and that it was the pilot's duty on VFR to make sure that it was. That is absolutely true. And that is a perfect expression of what VFR means. What should what should the pilot have done upon receiving that instruction turn left? Well, he should have been aware of his proximity to the terrain, Your Honor. He should have assured himself that he either went around the mountain or above the mountain. Now, it must be recalled here, Your Honor, that this plane was flying with inoperable terrain avoidance warning system. And the pilot knew that and the air traffic controllers didn't. There was no point in time during this flight, either before the approach to the tower or during communication with the tower, that the pilot communicated to the tower and said, hey, wait a minute, I'm going to have difficulty fulfilling my VFR duty because I have a malfunctioning terrain avoidance warning system in this aircraft. That was never communicated to our personnel. You are suggesting a way to avoid these broad preemption analysis by referring to the specific incident here. And I take it that you're suggesting that maybe if we just look at the duty of the aviation person there and by reference to the regulations and manuals and so on and what their duty was not insofar as it transferred to the pilot, then we don't have to really grapple with these larger preemption issues. I think what you're saying and what we've said in our brief, Your Honor, is that there are two discrete paths to summary judgment here. The district court, in our view, was correct on both. You are correct that either of the two and expressly the VFR negligence argument is sufficient to grant summary judgment to the defendants. Was it, I'm sorry, finish answering Judge Lohjead before I. Yes, I believe I finished, Judge Lohjead. Okay. But now my question is, was it the choice of the pilot to be flying VFR rather than on instruments, I guess, IFR? Yes. Or was there a choice open to him to say, no, we're flying from Bagram and we're going to fly instrument? Because they have the ability to do that. That's a great question, Your Honor. I heard that you might wish to review on that point. If this aircraft had run into difficulty and required for some reason to leave VFR status and go to IFR status, there was an off-site called the radar unit. It's described in the joint appendix starting in Darrell Smith's testimony at joint appendix page 791. But is it clear that this was within the discretion of the captain of the airplane? Indeed. Yes, the captain of the aircraft had the discretion to do that. He declared his flight to be VFR from the departure at Bagram. He was VFR at all times. And again, going back to Wojohowicz and all of the other common law as to this question of law, the mere communication with a tower does not somehow remove the VFR status and rest control from the pilot. It's exactly the opposite of what plaintiff's own expert, Julia Harvey, testifies. I would urge the court to read Ms. Harvey's, especially the parts that are cited in her brief. And if there are any other questions, I'd be happy to take them. I know my time is running short. I know that Mr. Ruth and I have lived this case for eight years. But if there are other cases or other issues, rather, that I've overlooked, I'd be happy to address them. Thank you. We'll hear the rebuttal. Thank you, Your Honors. Initially, the point that was brought at the beginning of counsel's argument, the plaintiff's claims are not based upon the resources or lack of resources in the tower. As Your Honors pointed out, it is the simple negligence of the air traffic controller and his going beyond what his responsibility should have been in taking control of the aircraft. Counsel had mentioned that there was an inoperable terrain avoidance system on the aircraft. That's simply not true. There was a color issue with the GPWS, but the testimony in this case is when you flow into Kabul, you would turn off the GPWS. And so that played no part in this case and should not play any part as far as the summary judgment is concerned. While counsel did take a very nice deposition of Ms. Harvey, our air traffic control expert, we did put in our reply brief at page 19, specifically her opinions with regard to there being joint responsibility between the air traffic controller and the pilot. And that's also what our piloting expert, Mr. Colin Summers, testified to, that when the air traffic controller made the decision and gave the direction to turn left, I will call your base, he then was assuming responsibility and it was a joint responsibility with the crew. The one thing that was not pointed out in addition to instructing the crew to turn left, I will call your base, the tower control controller sent the aircraft out of the control, the tower control airspace, which again, Ms. Harvey opined that the air traffic controller was not aware of where the TKU-662 was at. And by the fact that the air traffic controller did not know the location of TKU-662, it was negligence for the air traffic controller to give the direction to turn left, I will call your base. Can I ask you either a simple or a simpleton's question, and that is, what does call your base mean? Call your base, it's the traffic pattern, Your Honor, so there are the different legs of the traffic pattern, and the traffic pattern that brings you back to the airport would be calling the base to turn around and come back into the traffic pattern, and you can resume your VFR landing. That's call your base. It would be instructing the pilot to turn and come back to the airport for his base leg. For his... Base leg. There are the different legs of the pattern onto the airport, and the base being the one that is perpendicular to the runway. Just before you turn to land. Just before you would then make a right turn and then come down to land, yeah. Correct. And here's another simple, either simple or simpleton's question. What is it that you claim, what regulation or manual specifically do you claim the Midwest controller violated or failed to comply with? Well, what we have alleged, Your Honor, is the air traffic controller was supposed to be using ICAO, which is the international civil, and by saying that he would, what he ultimately did, and these were Philippine, Philippine crews, they were used to ICAO. He was then, the controller was using FAA terminology and was using terminology that's not approved by either ICAO or the FAA. And so he was basically using slang air traffic control, which again, our experts have opined would have confused the crew. What if I, is there a specific regulation or manual that they were bound by that he failed to comply with? Again, maybe a simple or simpleton's question. Just trying to answer that. No, Your Honor. What's interesting is with the plethora of manuals that are out there, both for the FAA and for ICAO, they don't tell you what not to do. They tell you what to do. So there is no specific rule or regulation that we point to to say, ah, you were in violation of that. What we look to is the custom and practice. And we look to the phraseology that is used by air traffic controllers. And this controller's deviation from that accepted custom and practice and the verbiage that is accepted and used by air traffic controllers. All right. Thank you both for your arguments. The court will reserve decision. We'll hear.